FILED

OCT 2 4 2022

Clerk of the Appellate Courts
Rec'd By _____

# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
### AT NASHVILLE
Assigned on Briefs July 6, 2022

## DIANNE MOORE v. BEACON TRANSPORT, LLC, ET AL.

**Appeal from the Workers' Compensation Appeals Board**
**Court of Workers' Compensation Claims**
**No. 2018-06-1503, Joshua Davis Baker, Judge**

---

### No. M2021-01451-SC-R3-WC – MAILED SEPTEMBER 19, 2022

---

Employee Dianne Moore experienced bilateral numbness, weakness, and tingling from her mid-chest down after performing a work-related task as a truck driver for Employer Beacon Transport, LLC. Following initial treatment in a local emergency room in Ardmore, Oklahoma, Employee was seen by Oklahoma City neurosurgeon Dr. Joseph Cox. Dr. Cox diagnosed Employee with an incomplete spinal cord injury in the form of a spinal cord contusion or lesion, which he opined resulted from her work-related activity. Employee was subsequently seen by panel physician, Nashville, Tennessee neurologist Dr. W. Garrison Strickland. Dr. Strickland diagnosed Employee with a thoracic spinal cord lesion caused by transverse myelitis, a condition which was not work-related. Employee additionally was seen by Nashville, Tennessee neurologist Dr. Darian Reddick, who similarly diagnosed Employee with idiopathic transverse myelitis syndrome-myelitis of unknown origin—a condition which was not work-related. Employee self-referred to Goodlettsville, Tennessee neurologist Dr. James Anderson, who indicated that Employee suffered a work-related back injury with effect on the spinal cord caused by back strain with transient give-way of structural elements traumatizing the spinal cord. The Court of Workers' Compensation Claims denied Employee's claim for benefits, and the Workers' Compensation Appeals Board affirmed. Employee has appealed, asserting that the trial court erred in accrediting the causation opinions of Dr. Strickland and Dr. Reddick, over the opinions of Dr. Cox and Dr. Anderson and concluding that she had failed to establish her condition was work-related. The appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law pursuant to Tennessee Supreme Court Rule 51. We affirm.

**Tenn. Code Ann. § 50-6-217(a)(2)(B) Appeal as of Right;**

**Decision of the Workers' Compensation Appeals Board Affirmed**

THOMAS J. WRIGHT, SR. J., delivered the opinion of the court, in which SARAH K. CAMPBELL, J., and ROBERT E. LEE DAVIES, SR. J., joined.

Dianne M. Moore, Erin, Tennessee, pro se, appellant.

Cole B. Stinson, Lansing, Michigan, for the appellees, Beacon Transport, LLC, and Accident Fund Insurance Company

# OPINION

### Factual and Procedural Background

Employee, Dianne Moore, testified live at trial. She was fifty-nine years old at the time of trial. She was employed by Employer, Beacon Transport, LLC, as an over-the-road truck driver. According to Employee, on March 11, 2018, she drove to Ardmore, Oklahoma to pick up a loaded trailer. When she got out of the seat of her tractor, she "had a twinge of pain in [her] right knee, and walking around, [she] had some numbness and tingling." Employee testified that she walked this off, checked in, dropped her empty trailer, and then went to connect the loaded trailer to her tractor. Because the trailer was so close to others, Employee had to crawl underneath it to reach the crank used to raise the trailer legs. Employee testified that she crouched on one knee and one foot, squatted underneath the trailer with her rear end almost touching the ground, and yanked hard on the crank handle a couple of times, using her whole body. According to Employee, she became instantly numb, "like snapping your fingers or switching a light." Employee was on the ground and had to climb from underneath the trailer and into her tractor to reach her phone. Employee contacted Employer and then called 911 for an ambulance, which transported her to the emergency room at a local hospital.

Employee testified that every time she moved or was moved she became more numb, particularly on her left side. She described it as numb from her chest down and testified that by the time she left the emergency room she could not walk without steadying herself on the wall. Employee testified that in the emergency room she underwent blood tests, x-rays, and an MRI of her lumbar spine. She was diagnosed with bilateral sciatica, released, and told to see the hospital clinic the next day. On March 13, 2018, Employer authorized Employee to see an Oklahoma City neurosurgeon, Dr. Joseph Cox. Employee was seen by Dr. Cox on March 15, 2018. According to Employee, Dr. Cox reviewed the emergency room records, performed an examination, and had more MRIs performed. Employee testified that she did not know Dr. Cox's diagnosis. She was simply told it was

okay for her to return home, and someone drove her there in her truck.

Employee was thereafter seen by two Nashville neurologists—her Employer-provided panel physician, Dr. Garrison Strickland, and Dr. Darian Reddick. According to Employee, she also has been seeing a chiropractor.[1]

Employee described her condition at the time of trial as follows:

> To this point, I am still numb from my chest down. It's very heavy on the right. I did start to improve greatly about 18 months into it. My bowels and bladder started working. I started walking better, and then I had a fall a couple of months later. I hit my head on a cinder block and my shoulder on the porch, and then there was a rock behind me on my back, in the center of my back that I fell on. I fell backwards. Since then, my bowels quit working and it's gotten a little worse. The squeezing around my chest is pretty bad. I cannot use my right foot to drive still. I don't have total control of my right foot, so I use my left foot when I drive.
>
> I had very bad balance after this incident. My legs are weak. The muscles between my ribs and my hip on my right side of my stomach, they release. It's just like they all of a sudden let go and I fall backwards. I'm really fortunate that I've only had two bad falls backwards in the last three years.
>
> I am working with a chiropractor. The issue with the balance with the muscles has just started. I have not had that issue for almost two weeks now. I can say I don't think I have to worry about falling backwards because my muscles aren't working anymore, which is really good. Sorry.
>
> So there are improvements. There's a lot of things that aren't improving. I think the falls have -- because of balance, my falls have kept me from completely improving as much as I should, but hopefully now with the chiropractor helping, and these muscles starting to work again, that shouldn't be an issue.

---

[1] No records from the chiropractor were introduced at trial or are contained in the record and therefore cannot be considered on appeal. Employee in her brief also refers to a chiropractor, Dr. Long, who she asserts Employer authorized her to see and who she asserts she saw on March 13, 2018, in Ardmore, Oklahoma. Employee did not introduce at trial any records or testimony from this chiropractor, however.

My legs are still weak.  I trip on my right foot -- I mean – I'm sorry, on my left foot.  And sometimes I fall forward, but I've not ever been hurt falling forward.  I think I've fallen forward three times in the last three years.

## The Medical Proof at Trial

Dr. Joseph Cox testified by deposition.  Dr. Cox is a board-certified neurosurgeon in Oklahoma City.  He specializes in complex spine cases.  Dr. Cox saw Employee one time on March 15, 2018, as a workers' compensation referral.  She presented with complaints of numbness, tingling, and some weakness mid-trunk down both sides.  Employee provided a history of climbing under a trailer and operating a crank, followed shortly after by numbness and tingling first on the left and then the right.  According to Dr. Cox, Employee presented with signs of myelopathy or something he would see with a spinal cord injury.  "She, you know, on the history side, the numbness and tingling, she had urinary incontinence weakness, but then, on the physical exam, again, she's clearly weak in the legs.  Her upper extremities were fine.  She also had sensory level or decrease sensation from around the T6 level down."

She already had a lumbar MRI, which showed some expected degenerative changes, but Dr. Cox wanted an MRI above that level and ordered cervical and thoracic MRIs.  Dr. Cox testified that the thoracic MRI showed increased T2 signal change, which he described as almost like a bruise or an area of fluid or edema inside the spinal cord.  He further testified that a lesion at that level, T5-6, fit Employee's clinical symptoms and presentation.  Dr. Cox's diagnosis at the time was a spinal cord contusion without ongoing stenosis, compression, or ongoing injury to the spine itself.  According to Dr. Cox, this is sometimes seen in trauma or a demyelinating process, "where it's an intrinsic issue with the spinal cord."  It is something that typically improves over time and surgical intervention is not considered.

Dr. Cox testified that:

I think, you know, given the sudden onset, the findings on the MRIs, I would still lean toward that diagnosis of an incomplete spinal cord injury, again, that we would expect would improve with time, but, you know, I haven't seen Ms. Moore as a patient in clinic to examine her or anything since the initial visit in March of 2018.

Employee's MRIs did not show anything suggesting other than a degenerative process, but according to Dr. Cox, he would not expect to see the increased T2 signal change with degenerative changes.  He further testified, however, that it can happen.  In the case of

- 4 -

Employee, there was no sign on the MRI of any acute disc herniation or acute change that would explain the onset of her symptoms. The T2 signal change tells him, though, that there's been some sort of injury to the spinal cord. Dr. Cox recommended a course of steroids to speed the healing process and follow-up with Employee's primary care physician and possibly a neurologist on her return to Tennessee.

Dr. Cox was of the opinion that Employee's spinal lesion was more likely the result of an injury than a demyelinating lesion. As he explained in reference to a subsequent report from Employee's treating neurologist, Dr. Garrison Strickland:

> A. So, you know, according to this neurologist that she saw, again, April 2nd, at that point, she was improving some but still had symptoms. Neurologist's concern was for an intrinsic lesion or issue with the spinal cord such as transverse myelitis. He did not believe that it was work-related or an injury that caused these symptoms. Recommended some further testing. Yeah.
>
> Q. (By Mr. Stinson). He suspected transverse myelitis, is that right?
>
> A. He did.
>
> Q. What is transverse myelitis?
>
> A. It's an intrinsic problem with the spinal cord where it's a demyelinating disease, where myelin is the kind of lining of the axons and the nerves in the spinal cord or in the body. And without the normal myelin nerve sheath, there's a conduction issue, is basically the problem. That can show up on imaging as, you know, increased T2 signal change as well. And, you know, the original radiologist did mention a possible demyelinating process as something on the differential. For me, personally, seeing something with a sudden onset after, you know, doing some strenuous activity, and, you know, her work-related issues, I felt that this was more likely a -- an injury and not just a demyelinating lesion that randomly showed up the same time she was doing some strenuous activity.
>
> ...
>
> Q. So -- and I just -- I want to make sure I understand the difference. So the transverse myelitis that Dr. Strickland's

talking about, that is something that would not typically be caused by trauma.

A. Correct.

Ultimately, Dr. Cox disagreed with Dr. Strickland's diagnosis of transverse myelitis as the cause of Employee's spinal lesion and condition:

Q. So is it unfair for me to characterize it that you disagree with Dr. Strickland's diagnosis?

A. I do. I mean, again, the transverse myelitis, it's very rare. This was more of a sudden onset after what seemed like a, you know, a work-related injury. And with the, you know, a history of even, you know, some mild trauma, you know, that's not something that then you would say, you know, oh, your transverse myelitis just became an issue because you bent or twisted or turned wrong or whatever.

I mean, usually, the transverse myelitis is kind of a spontaneous thing that slowly gets worse. And, you know, that did not appear consistent to me with what we were seeing here.

That being said, Dr. Cox also testified that Dr. Strickland and Dr. Darian Reddick both had performed appropriate workups for myelitis and that the diagnosis of transverse myelitis was not unreasonable.

Dr. Cox also disagreed with the C-32 report of Employee's subsequent evaluating physician Dr. James Anderson, in which Dr. Anderson indicated that Employee suffered a herniated disk. According to Dr. Cox, there was no clinically relevant thoracic abnormality; there was some bulging but no herniation. Dr. Cox acknowledged that thoracic lesions without any structural abnormality are rare and that he does not commonly see traumatic injuries by the means Employee described. Yet he still was of the opinion, in light of Employee's history and sudden onset of symptoms, that her spinal lesion and condition were the result of a traumatic event rather than transverse myelitis.

Dr. W. Garrison Strickland also testified by deposition. Dr. Strickland is a board-certified neurologist in Nashville with twenty-five years of experience. He also is a certified independent medical examiner. Dr. Strickland was selected by Employee from an Employer-provided panel of three neurologists. He saw Employee on one occasion, April 2, 2018, as her panel-selected treating neurologist.

- 6 -

Employee provided Dr. Strickland a history of turning a crank on the trailer of her truck and experiencing right flank and leg pain with symptoms spreading to her other side. She felt weakness in her legs and lost control of her bladder. Her history included treatment in the local emergency room with x-rays and an MRI of the lumbar spine, followed by treatment in Oklahoma City, including cervical and thoracic MRIs, the latter of which showed a vague signal change thought by the radiologist to possibly represent a demyelinating lesion. She came to see Dr. Strickland for further investigation following her return to Tennessee.

Employee described her condition at the time of this visit as follows: balance improved; still some weakness in the lower extremities, with numbness and tingling from about the waist down on the left into both lower extremities; low-grade headache requiring no medication and no other pain; urinary incontinence improved; constipation treated with enema. Dr. Strickland reviewed Employee's MRI films and the thoracic MRI indicated a spinal cord lesion at the T6-T7 level. Dr. Strickland saw nothing else of any clinical significance on the films. Dr. Strickland performed a physical examination of Employee during which he found as follows:

> I noted relevant findings are that she had give-way weakness of her legs. She was able to walk on her heels and toes. She had decreased sensation to pinprick in the hands and feet. Light touch was decreased for the sensory level at the waist on the left and around the bowel line on the right.

> Reflexes were symmetric and unremarkable. I did not see a Babinski sign or saw no clonus. Her muscle tone was normal. She had a tentative gait with a limp.

Dr. Strickland thought Employee's symptoms, exam findings, and MRI findings were consistent with a thoracic cord lesion, and he suspected the cause was transverse myelitis, but he did not rule out other causes. Dr. Strickland's impression at the time was that the spinal cord lesion was not related to a work incident. He "thought the symptoms and the findings on the MRI were all consistent with possible transverse myelitis."

Transverse myelitis is not caused by trauma, and Dr. Strickland did not view Employee's condition as work-related. He felt "it was more than likely just incidental that she was turning the crank when she had onset of symptoms." In his deposition testimony, Dr. Strickland agreed with Dr. Darian Reddick's subsequent opinion in this regard. He viewed transverse myelitis as "the most likely explanation" of Employee's condition. He based this on the situation, the history, the physical findings, and the findings on imaging studies. He saw no traumatic injury and no evidence of an injury to cause the spinal cord lesion in this case. He did not view Employee's physical activity at the time of symptom

onset as sufficient to cause injury to her spinal cord. Dr. Strickland encouraged Employee to talk to her primary care physician and suggested that she see a neurologist. He also referred Employee to a urologist for her urinary incontinence.

Dr. Darian E. Reddick likewise testified by deposition. Dr. Reddick is a board-certified neurologist with a subspecialty in the field of neuromuscular medicine and practices in Nashville. He treats patients with disorders of the nervous system and has a subspecialty with added training in disorders affecting sensory and motor impairment of the arms and legs.

Dr. Reddick first saw Employee on May 31, 2018, on referral from the Houston County Health Department. Employee provided a history of acute onset of neurologic deficit while performing a cranking maneuver on her truck. Employee developed acute onset of numbness on the chest or breast area, which spread down to her waist and into her legs. Employee reported that at the time the numbness was quite severe and she had to go to the emergency room.

Dr. Reddick had MRI reports from previous studies, lab reports, and a note from Dr. Strickland. Dr. Reddick performed a physical exam, which revealed severe sensory loss in the leg and a sensory level; that is, a sensory impairment from a point on her body downwards towards her foot. Dr. Reddick diagnosed Employee with transverse myelopathy syndrome, neurogenic bladder, and sensory ataxia.

Dr. Reddick explained myelopathy as a generic disease or impairment of the spinal cord and transverse myelitis syndrome as a condition in which several segments of the spinal cord have become impaired due to a disease. There is a nonstructural disease, as opposed to a tumor or some type of disk herniation, to the spinal cord that has caused the person to have significant impairment. It is not typically of traumatic origin.

Dr. Reddick agreed with Dr. Strickland that Employee's condition was not the result of a work-related injury. According to Dr. Reddick, he explained to Employee that:

> from the best of my knowledge, even if a handle is very heavy or had a lot of resistance, there's no great way that this type of spinal cord injury that I could see would be related to any type of work-related inciden[t], although it did seem rather coincidental that it occurred while she was performing a work-related task.

Dr. Reddick investigated many of the potential causes of Employee's transverse myelitis, none of which was related to trauma or a structural issue that would be related to an employment activity. These would most often include some type of infection, inflammation, autoimmune diseases, or generalized systemic diseases. Dr. Reddick did a

- 8 -

large panel of studies attempting to identify the cause of Employee's symptoms but was unable to determine one. As a result, his diagnosis was idiopathic transverse myelitis; that is transverse myelitis of unknown origin.

Employee was seen by Dr. Reddick again on June 8, 2018, and on July 12, 2018. At that latter visit, she brought in her MRI scans from Oklahoma, including her thoracic MRI, at his request. Dr. Reddick wanted to see if Employee had an abnormality on earlier imaging which had disappeared over time and so did not show up on the subsequent imaging. Dr. Reddick identified a "linear hyperintense lesion" in that thoracic MRI, which confirmed his diagnosis of myelopathy. Based on the fact that the lesion on Employee's original thoracic MRI had subsequently disappeared, Dr. Reddick was of the opinion that it was more probable than not that her condition was of an inflammatory or infectious etiology rather than the result of a compressive lesion or problem.

According to Dr. Reddick, it was more likely than not that Employee had an isolated infectious or inflammatory assault on her spinal cord leading to her condition. Dr. Reddick testified that while Employee's symptoms were "obvious and real," they were not caused by her employment. Dr. Reddick was of the opinion that the disk bulges or protrusions identified on Employee's MRIs did not relate to the lesion inside her spinal cord, which was causing her symptoms and did not cause any impairment to her spinal cord. In his opinion, the diagnosis of idiopathic transverse myelopathy syndrome was the most appropriate diagnosis.

Dr. Reddick testified that none of the material Employee presented regarding the circumstances of the onset of her symptoms altered his opinion. Dr. Reddick recommended a course of steroids, a neuropathic pain medication, and a referral to a urologist for her bladder abnormality.

Employee self-referred to Goodlettsville neurologist Dr. James P. Anderson. Dr. Anderson did not testify live or by deposition. Instead, he furnished a Standard Form C-32 Medical Report, a Form C-30A Final Medical Report, and a Physician Certification Form. In addition, Dr. Anderson's medical notes were made an exhibit. Dr. Anderson first saw Employee on August 23, 2019. According to the Form C-32, completed October 6, 2020, Employee complained of left [?][2] arm and both leg pains, numb chest to toes. On the Form C-32, Dr. Anderson indicated that on exam, Employee demonstrated loss of sensation in both feet, mild weakness right foot, and increased reflexes both ankles. In his August 23, 2019 note, Dr. Anderson identified the following diagnoses: 1) Cervical Myelitis; 2) Thoracic Myelitis; 3) Hypoesthesia in LE's [lower extremities]; 4) Paresthesias; 5) Distal R LE [right lower extremity] weakness; 6) Incontinence B/B [bowel

---

[2] Dr. Anderson's handwritten notes and forms are at points difficult to decipher.

and bladder]; 7) Ataxia; 8) C Radic[?]. He then indicated "Consider MS, Trans[verse] Myelitis, Trauma."

Dr. Anderson indicated that to confirm these diagnoses, he would need to review MRI reports, the emergency room report, blood and CSF labs, and have performed an upper extremity SSEP, a lower extremity SSEP, and an upper extremity EMG. He prescribed Baclofen and indicated Employee might benefit from a urology referral. Dr. Anderson again saw Employee on November 27, 2019, following a fall, and on December 4, 2019, Employee underwent a thoracic epidural injection.

According to the Form C-32, Dr. Anderson's final evaluation of Employee was on September 23, 2020. However, there is no note from that date in Dr. Anderson's office notes. Dr. Anderson indicated on the Form C-32 that Employee's records had been reviewed; that testing included radiologic tests and electrophysiologic tests; that treatments included oral medications, bracing and focal medication injections plus physical therapy. He further indicated that Employee was completely off work from March 11, 2018, through the date of the completion of the Form C-32 and that he did not recommend that she return to work. Dr. Anderson imposed restrictions of no lifting over 20 pounds, no sitting for more than 30 minutes at a time, no twisting or turning at the waist or shoulders, and no work overhead.

On the Form C-30A Final Medical Report, also completed on October 6, 2020, however, Dr. Anderson indicated Employee reached MMI and could return to work with restrictions as of September 23, 2020,[3] required no future treatment, and retained a 2% permanent partial impairment to the body as a whole. He described her injury as a "[b]ack injury with effect on spinal cord," and he indicated that the mechanism of injury was "[?] back strain with transient give-away of structural elements traumatizing spinal cord." He further indicated that the incident causing this injury was Employee's pulling on a crank between two trailers. Finally, he indicated that Employee's employment activity more likely than not was primarily responsible for the injury or the need for treatment.

**Trial and Appeals Board Proceedings**

On August 20, 2018, Employee filed a petition for benefit determination with the Tennessee Bureau of Workers' Compensation, Court of Workers' Compensation Claims. Following an expedited hearing, the trial court denied Employee's interlocutory claim for benefits. Employer filed a motion for summary judgment, contending that Employee was unable to establish that her injury arose primarily from the alleged work accident, and Employee filed a response in opposition. The trial court denied Employer's motion.

---

[3] On a Physician Certification Form completed by Dr. Anderson on November 27, 2019, he had certified "that due to permanent restrictions on activity the employee has suffered as a result of the injury the above-named employee no longer has the ability to perform the employee's pre-injury occupation."

- 10 -

Following additional discovery, the trial court held a compensation hearing. On June 30, 2021, the trial court entered a compensation order denying Employee's claim for benefits. The trial court concluded that Employee had not met her burden of establishing that her condition was caused by her employment-related activities. The court applied the statutory presumption, Tennessee Code Annotated section 50-6-102(14)(E), to the opinion of Employee's panel neurologist, Dr. Strickland, and determined that nothing in the opinions of Drs. Cox or Anderson overcame that opinion or the concurring opinion of Dr. Reddick.

Employee appealed to the Workers' Compensation Appeals Board. The Appeals Board filed an opinion on October 29, 2021, affirming the trial court and certifying the order as final. Moore v. Beacon Transport, LLC, No. 2018-06-1503, 2021 WL 5105749 (Tenn. Workers' Comp. App. Bd. Oct. 29, 2021).

Employee has appealed. Although Employee states several issues in her brief, these may be reduced to a single issue: whether the trial court erred in determining that Employee failed to overcome the statutory presumption accorded Dr. Strickland's causation opinion and so failed to meet her burden to establish by expert medical evidence the causal relationship between her claimed injury and the employment activity.

**Standard of Review**

Review of factual issues is de novo upon the record of the trial court, accompanied by a presumption of correctness of the trial court's factual findings, unless the preponderance of the evidence is otherwise. See Tenn. Code Ann. § 50-6-225(a)(2) (2014 & Supp. 2021). When the trial court has seen and heard the witnesses, considerable deference must be afforded the trial court's factual findings. Tryon v. Saturn Corp., 254 S.W.3d 321, 327 (Tenn. 2008). No similar deference need be afforded the trial court's findings based upon documentary evidence such as depositions. Glisson v. Mohon Int'l, Inc./Campbell Ray, 185 S.W.3d 348, 353 (Tenn. 2006).[4] Similarly, reviewing courts afford

---

[4] The majority of the Appeals Board concluded that the trial court had not abused its discretion in accrediting the causation opinion of Dr. Strickland over other expert opinions and that the totality of the evidence did not preponderate against the trial court's decision. Moore, 2021 WL 5105749, at *4. The concurring judge agreed with the majority's conclusion that the preponderance of the evidence supported the trial court's decision and with the majority's affirmance of the trial court's order denying Employee's claim for benefits. Id. (Hensley, J., concurring). The concurring judge, however, disagreed with the majority's application of an abuse of discretion standard of review to the trial court's decision to accredit the opinion of Dr. Strickland over that of other experts when all of the expert testimony had been presented by deposition or in some other documentary form. Id. at *4–12. Because we conclude that, considering the totality of the evidence, Employee failed to overcome the statutory presumption accorded to Dr. Strickland's opinion regardless of which standard of review is applied, we need not and do not resolve that question.

no presumption of correctness to a trial court's conclusions of law. Seiber v. Reeves Logging, 284 S.W.3d 294, 298 (Tenn. 2009).

## Analysis

The question in this case is one of causation. As with all the elements of her claim, Employee has the burden of proving causation by a preponderance of the evidence. Tenn. Code Ann. 50-6-239(c)(6) (2014 & Supp. 2021). "'Except in the most obvious, simple and routine cases,' a claimant must establish by expert medical evidence the causal relationship between the claimed injury and the employment activity." Cloyd v. Hartco Flooring Co., 274 S.W.3d 638, 643 (Tenn. 2008) (quoting Orman v. Williams Sonoma, Inc., 803 S.W.2d 672, 676 (Tenn. 1991)). The opinion of the treating physician selected by the Employee from the Employer's designated panel of physicians "shall be presumed correct on the issue of causation but this presumption shall be rebuttable by a preponderance of the evidence[.]" Tenn. Code Ann. § 50-6-102(14)(E) (Supp. 2021).

Employee contends, in the main, that "[her] claim was denied based on wrongful manipulation of the facts and withheld medical evidence by the defendant[]." She suggests that if the trial court had all of the relevant medical evidence before it, it would not have applied the statutory presumption and accredited the opinion of Dr. Strickland over that of Drs. Anderson and Cox, and it, therefore, would have reached a different result.

Employer, on the other hand, contends that:

[a]s the *only* physician chosen from a panel, Dr. Strickland's opinion as to causation 'shall be presumed correct' unless rebutted by a preponderance of the evidence. Tenn. Code Ann § 50-6-102(14)(E). However, the Court need not have merely rested on the presumption. Dr. Strickland's opinion is bolstered by the opinion of Dr. Reddick, Employee's own physician. With or without the benefit of the presumption, the weight of the evidence establishes that Ms. Moore has non-work-related, idiopathic, transverse myelitis.

The record does not support Employee's claim that the trial court's decision or that of the Appeals Board was the result of withheld or manipulated evidence or information. Nor does Employee offer any substantive challenge supporting reversal.

In her brief, Employee undertakes to attack the opinions of Dr. Strickland and Dr. Reddick and to bolster that of Dr. Anderson. Employee's criticisms, however, fail to overcome the statutory presumption in favor of Dr. Strickland's opinion. Review of the deposition testimony of all of the physicians, and in the case of Dr. Anderson his C-32 and C-30A and notes, does not compel a different decision with respect to which expert to

accredit or a different conclusion as to causation.

While Dr. Cox opined Employee's spinal lesion was caused by trauma, he acknowledged that Dr. Strickland's and Dr. Reddick's diagnosis of transverse myelitis was not unreasonable. Moreover, Dr. Cox did not have the advantage of subsequent diagnostic imaging which, when compared to Employee's original thoracic MRI, revealed to Dr. Reddick that the lesion on Employee's original thoracic MRI had subsequently disappeared. That, in turn, supported the diagnosis of idiopathic transverse myelitis as the cause of Employee's condition. As for Dr. Anderson's opinion, the trial court and the Appeals Board rightly noted its limited impact due to the absence of actual testimony providing any context or explanation. While properly admissible on the issue of causation, the C-32 and C-30A do not here suffice to overcome the detailed deposition testimony of Dr. Strickland, as supported by that of Dr. Reddick.[5]

Having thoroughly reviewed the testimony and evidence in this case, we agree with the trial court and the Appeals Board that Employee failed to overcome the rebuttable presumption of correctness as to the cause of her spinal condition. The preponderance of the evidence supports the opinion of Dr. Strickland. Therefore, Employee failed to establish by expert medical evidence the causal relationship between her claimed injury and the employment activity.

## Conclusion

For the foregoing reasons, the decision of the Appeals Board is affirmed. Costs on appeal are taxed to Plaintiff-Appellant, Dianne Moore, for which execution may issue if necessary.

THOMAS J. WRIGHT, SENIOR JUDGE

---

[5] Employee's contention that the trial court and the Appeals Board erred in stating that all of the doctors saw Employee only one time and that Dr. Anderson actually saw her multiple times does not undercut the application of the presumption. As noted, Dr. Anderson's records admitted into evidence indicate three visits, one of which was for a steroid injection and one of which followed a fall. Only one visit appears to have been directly related to ascertaining the cause of Employee's condition. Moreover, Dr. Reddick saw Employee three times and supported Dr. Strickland's opinion as to causation.